**Barry David WILLIAMS, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 10–06–00045–CR.**

Court of Appeals of Texas, Waco.

Jan. 24, 2007.

---

Richard G. Ferguson, Waco, for appellant.

John W. Segrest, McLennan County Dist. Atty., Waco, for appellee.

## DISSENTING OPINION

TOM GRAY, Chief Justice.

This is a really simple case. The question, the legal question, is whether the evidence was sufficient for a jury to find the defendant guilty. Because the victim, the wife, recanted the statement she gave police the night of the incident, and said she could not remember if the defendant, her husband, pulled her braids and that having her braids pulled out did not hurt, we are left with no direct evidence.[1] But based upon the evidence, even the evidence as summarized by the majority, any person that has even a modest amount of common sense can reasonably conclude from the circumstantial evidence presented that during the course of an argument with his wife, over why he had another woman in his den when his wife came home, the defendant grabbed the braids of his wife's hair through the partially rolled-down car window and, in the terminology of my upbringing, he "snatched a bald spot" on her head as he forcibly removed three of her braids. Based upon common sense, common experience, the testimony of the officer that she was holding her head and that the spot was red on the night of the incident, and the photographs introduced into evidence, it would be hard for any reasonable person to conclude anything other than that the defendant pulled out the braids and that it hurt, regardless of what the victim's other testimony was.

See Eade v. State, No. 05–06–01021–CR, 2006 WL 3734972, 2006 Tex.App. LEXIS 10786 (Tex.App.-Dallas Dec. 20, 2006, no pet. h.) ("Therefore, the jury could have disbelieved Teeka's testimony that appellant did not cause bodily injury to her by striking her face with his hand.")

The circumstantial evidence in this case is more than sufficient for reasonable jurors to conclude that Mr. Williams was guilty of family violence.

## APPENDIX

Q. What's the first thing that you remember about March 23rd of 2005?

A. Coming home and arguing with my husband.

Q. Okay. When you said you came home, did you come home to 3113 Orchard Lane?

A. Yes, that's home.

Q. What was your husband doing when you arrived?

A. Well, he had company. It was a female there.

Q. Where was your husband when you arrived?

A. Well, when you walk in, you know, it's a big den there, so in the den.

Q. So your husband was in the den. Where was the female?

A. In the den.

Q. And what occurred?

A. I went off the chain. A female at my house. I don't do females.

1. A portion of the victim's testimony is attached as Appendix 1 to this dissenting opinion. In addition to the testimony from the victim, the jury also heard the police officer testify regarding her holding her head when she was first seen approaching the officers, and that the spot was red. Also, the jury had before it a picture of her head on the night of the argument and photographs of the three braids, or "dreds," found in the front yard of her home where the argument and altercation with the defendant occurred.

Q. So you were angry with your husband?

A. Oh, I was angry.

Q. What did you do next?

A. Well, you know, after a few choice words and—and I'm pretty sure I was a little mad, a little crazy.

Q. And was Mr. Williams angry as well?

A. He's trying to explain something to me and I don't want to hear it.

Q. What was he trying to explain to you?

A. That—you know, who this is.

Q. What did he tell you?

A. I have no idea.

Q. You don't remember what your husband said to you regarding this other woman?

A. I don't remember the argument. I was so upset until all of that went over my head. You know—

(R.R., Vol.3, p.72, l.3–p.73, l.10)

Q. Okay. And does this statement help refresh your recollection regarding how long you argued with the defendant?

A. Yeah. I think I argued about an hour and a half on here, but that might be stretching it a little bit.

(R.R., Vol.3, p.74, l.12–16)

Q. Was the female there during the hour and a half argument?

A. No.

Q. When you got in your car, what did you do next?

A. Probably just backed up and left.

Q. Okay. And when you left, where did you go?

A. I believe I went over to my mother's house.

(R.R., Vol.3, p.76, l.13–19)

Q. Then where did you go?

A. Home.

(R.R., Vol.3, p.79, l.7–8)

Q. Okay. And then where did you— where did your car go next after you parked there?

A. After I parked there is when I, you know, leaving the driveway with Barry hanging on.

Q. Okay. So when you left your driveway, where did you go? What physical location did you go to?

A. I had threw my Camero in reverse and it went all the way back to the end of my driveway.

(R.R., Vol.3, p.81, l.3–10)

Q. Okay. When did you first see him after you had returned to the residence around 10:06 and remained in your car for a while?

A. Coming out of the back door we have a cement slab-ramp deal.

Q. What was your husband wearing when he came out the back door?

A. He had a robe. Probably, you know—probably some underwear and a robe. No shoes.

Q. Were you—where were you situated when he came out of the house?

A. I'm in the driveway.

Q. Okay. Are you in the car or out of the car?

A. I'm in the car.

Q. Is the—are the car doors open or shut?

A. The doors?

Q. Yes, ma'am.

A. They're closed.

Q. So all four doors of the car were shut?

A. Two doors for a Camero and both were closed. Yes.

Q. Okay. Two doors shut. Were the windows up or down?

A. Always on the passenger's side up and I had a crack. That's what I was doing when I was sitting out there. I was smoking a cigarette and I had a crack to, you know, get the smoke out.

Q. Okay. So during the time period that you were calming down, you were smoking a cigarette?

A. (Nodded head.)

Q. And the window was down. Can you show the jury, using your hand, approximately how far down your window was?

A. Just enough to get the smoke out. I'm in there smoking. A Camero is a small car, so about like so. (Indicating.)

Q. So about four or five inches?

A. Well, whatever that is. (Indicating.) A couple.

Q. When your husband came out, had you finished your cigarette?

A. Yes.

Q. Where was the cigarette?

A. Out the window.

Q. After you finished your cigarette, did you roll the window up?

A. No, because this is—by the time I'm thumping the cigarette out to prepare myself to go in the house, you know, I hadn't had a chance to roll anything up.

Q. When your husband came out then, of the house, the window was partially down?

A. You know. (Indicating.)

Q. The same amount as you said before, four or five inches?

A. However much that is. (Indicating.) Yes.

Q. Okay. You didn't change the position of the window when your husband came out?

A. Not at that point. No.

Q. What happened next?

A. He came down the ramp and he was saying something to me and—

Q. What was he saying to you?

A. The gist of it is he wanted me to come in the house.

Q. Okay. Well, can you tell me his exact words that he used, please?

A. Oh, God. You know, anything, "What you think you doing? Come in the house." You know, sort of like that. I was—

Q. I mean, did he curse?

A. He used—he—no.

Q. Okay.

A. I mean, I don't hear any cuss words because you have to understand where my mind still was.

Q. So if he cursed, you don't know?

A. (Shook head.) At that point, I'm—he could have been, but I am in a state.

Q. Okay. Did he—what—where in the yard was your husband as he spoke to you?

A. He was still on the ramp.

Q. He was still on the ramp?

A. Yes. He was still on the ramp when he was talking to me and I'm parked there.

Q. Okay. Is the ramp at the back door?

A. Yes. The ramp is like you're going toward the car. Yes.

Q. How far away from you was he when he spoke with you?

A. Okay. Well, the car was parked—the car was parked—the end of my

ramp is probably right there behind your chair. The ramp.

Q. So from you to me?

A. Uh-huh.

Q. Is that about how far y'all were when he was speaking with you?

A. Yes.

Q. And did he ever get closer to you?

A. Yes.

Q. Okay. How did he come closer to you?

A. He was headed toward the car, coming toward the car.

Q. And was he saying anything as he came towards the car?

A. Whatever he was saying, I was saying something at this point.

Q. So you're both arguing then?

A. Well, I was saying, I—you know, "I don't want to talk. You've got nothing to say," sort of.

Q. Because you're still upset about the girl being there?

A. Yes.

Q. Okay. What happened next?

A. Okay. He was coming toward the car and I'm—I'm shouting, you know, "I don't hear you. I don't want to hear you." And I crank up my car.

Q. So you turned your car on?

A. Yes. I'm cranking it up.

Q. Okay.

A. I'm not going to hear him.

Q. Okay. What happened next?

A. He comes over and says something. And the next thing I know, he sticks his hand in the window—or trying to put his hand in the window to undo my—that's what he was hollering, "Unlock the door. Unlock the door." And I wasn't having him unlocking the door.

Q. What type of locks did you have? Were they power locks or—

A. Yes. Power. So he was trying to reach that but he couldn't get in. His arms are too big.

Q. What happened next?

A. So when I see that his hand's coming in trying to reach for that, you know, I'm, you know, hitting his hand. And I threw my car in reverse.

Q. So you were trying to keep him from unlocking the door?

A. And I did not want him to hit that lock. I'm moving him and trying to hit the lock myself.

Q. Why did you not want him to unlock the door?

A. I was not going to listen to—I mean, there's nothing he could tell me at that point. If he—if I had, you know, some time to cool down or anything, then I would listen to him. But this was not the time. I didn't—he couldn't talk to me.

Q. Was he able to unlock the door?

A. No.

Q. Okay. What was he able to do?

A. He was able to hang on for dear life because I took that Camero and I went to the end of my driveway.

Q. So you went in reverse first?

A. Oh, yeah.

Q. And after you went in reverse, which direction did you go?

A. I came to a screaming halt at the end of Orchard Lane right there, threw it in drive, spin all the way around to the front part of my house like a mad woman, but—and when I came to the curb down there, came to a screaming halt. The next thing I knew I saw a body.

Q. Okay. When you went in reverse, where was the defendant.

A. One thing for sure, his hand was in—was in my car.

Q. Did you realize his hand was in the car when you went in reverse?

A. Yes, because I'm fighting like this here to raise the window up.

Q. Okay. And then at some point you quit going in reverse?

A. Yes.

Q. Okay. And then you put it in drive?

A. From reverse, I hit drive. Yes.

(R.R., Vol.3, p.89, l.9–p.93, l.1)

Q. So when you went from reverse to drive, what was your purpose for doing that?

A. Kill him. Not kill, murder, murder, but he had me in a state of mind and I didn't care at that point.

Q. Was he hanging onto your hair?

A. If he was, that's the only thing that saved him.

Q. What did you do next?

A. When I hit drive, I spun around all the way around you know, in the driveway of my—of the front of my yard, came to that screaming halt, slammed on my brakes, you know, and I'm telling you, the next thing I saw was a body. Wherever he was, he had come loose then.

Q. So you drove through your yard?

A. Oh, yeah.

(R.R., Vol.3, p.93, l.25–p.94, l.13)

Q. Okay. And you previously testified that he had his arm in the car; is that correct? That the defendant has his arm in the car?

A. Yes.

Q. Okay. So how is it that your braids came out? Did they just come out—they just fell out or did he yank the braids out of your hair?

A. No. I was trying to explain. I don't know when he grabbed my hair.

Q. Okay. I know you don't realize during this time period when he grabbed your hair, but did he grab your hair?

A. I'm going to assume so because I do have missing braids.

(R.R., Vol.4, p.12, l.4–16)

Q. Did it hurt when the braids were forced out?

A. I don't know when they came out.

Q. Okay. But did it hurt?

A. Nope.

(R.R., Vol.4, p.14, l.3–6)

Q. And now you're saying you don't know if it hurt or not?

A. Ma'am, I was too hyped up, hurt.

(R.R., Vol.4, p.14, l.23–25)

Q. When you went to Skinny's at around 10:16, based on—I'm sorry, about—yeah, 10:16 you went to Skinny's, 10:11 or 10:16, were you upset?

A. I'm afraid so. Yes.

Q. Okay. Had you been crying?

A. Probably.

Q. Okay. Did your head hurt at that point?

A. No.

(R.R., Vol.4, p. 15, l.22–p.16, l.4)